2026 IL App (2d) 250365
No. 2-25-0365
Opinion filed July 13, 2026

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,

v.

DANIEL J. DUDDLESTON, Defendant-Appellant.

Appeal from the Circuit Court of McHenry County.
Honorable Tiffany E. Davis, Judge, Presiding.
No. 24-CF-522

PRESIDING JUSTICE KENNEDY delivered the judgment of the court, with opinion.
Justices Jorgensen and Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1 Defendant, Daniel J. Duddleston, appeals from his convictions of aggravated fleeing (625 ILCS 5/11-204.1(a)(1), (2) (West 2022)) and driving with a revoked license (*id.* § 6-303(a), (d-3)). He contends that the trial court erred in two ways: (1) by denying him a full *Krankel* (*People v. Krankel*, 102 Ill. 2d 181 (1984)) hearing with independent counsel and (2) by denying him sentence credit, pursuant to section 3-6-3(a)(4.2)(A) of the Unified Code of Corrections (Code) (730 ILCS 5/3-6-3(a)(4.2)(A) (West 2024)), for working in the kitchen and attending classes while at the county jail. Regarding defendant's second argument, he contends that *People v. Williamson*, 2024 IL App (3d) 220501, was wrongly decided in that it improperly held that prisoners cannot receive sentence credit under section 3-6-3(a)(4.2) for pretrial programming. For the following

reasons, we affirm the judgment and remand with instructions to make findings on defendant's sentence credit due under section 3-6-3(a)(4.2).

¶ 2                                    I. BACKGROUND

¶ 3      Defendant's convictions stem from an incident on May 29, 2024, in which an officer attempted a traffic stop on a car allegedly driven by defendant, which fled and ultimately evaded the traffic stop.

¶ 4      On August 15, 2024, defendant was indicted on nine counts, three of which were felonies: two counts of aggravated fleeing (625 ILCS 5/11-204.1(a) (West 2022) (Class 3 felonies)), in that defendant, as the driver of a motor vehicle, willfully failed to obey a peace officer's direction to stop his vehicle and, in doing so, drove at a rate of speed at least 21 miles per hour over the legal speed limit (*id.* § 11-204.1(a)(1) (count 1)) and disregarded two stop signs (*id.* § 11-204.1(a)(4) (count 2)); and one count of driving while his driver's license was revoked (*id.* § 6-303(a)), which was charged as a Class 4 felony because this was allegedly his fourth such violation (*id.* § 6-303(d-3) (count 3)).

¶ 5      The remaining counts were three misdemeanor counts for driving while license revoked (*id.* § 6-303(a)), reckless driving (*id.* § 11-503(a)), and speeding (*id.* § 11-601.5(a)) and three petty counts: two for disobeying a stop sign (*id.* § 11-1204(b)), and one for operating an uninsured motor vehicle (*id.* § 3-707(a)). Prior to trial, the State dismissed the three petty counts and the misdemeanor count for driving while license revoked. It proceeded on the remaining five counts.

¶ 6                                    A. Trial

¶ 7      The case proceeded to a jury trial on March 10, 2025. The State's first and only witness was Officer Laszlo Kocsor, who testified as follows. On May 29, 2024, he was employed by the

Spring Grove Police Department and performed routine patrol. Around 1:44 a.m., he was in his marked patrol vehicle in the parking lot of a Mobil gas station on Illinois Route 173.

¶ 8 From his vehicle, Kocsor observed a 2013 bronze Hyundai Elantra parked in front of the gas station. He also observed two individuals inside the gas station by the front entrance, about 30 feet away from him. He recognized one of the individuals in the gas station as defendant, so he parked across the street on Wilmot Road and turned off his headlights.

¶ 9 Kocsor testified that defendant exited the gas station with two individuals: a female with brown hair, wearing a white jacket, and a male with blonde hair, wearing a white shirt and a black and white ball cap. Defendant was wearing a dark sweater and dark pants, and Kocsor observed him enter the driver's seat of the Hyundai. The other two individuals entered the car from the passenger side, one in the front and one in the back.

¶ 10 Kocsor explained that he had had contact with defendant six days prior to May 29, 2024. It was a "consensual encounter" at the intersection of U.S. Route 12 and Asbury Court in Spring Grove with defendant and another male. Kocsor and defendant spoke face-to-face, and Kocsor asked him for his driver's license or ID card. Defendant responded that he did not have one on him. Kocsor then asked for his name and date of birth, which defendant provided. He ran the information in his patrol vehicle and discovered that defendant had a revoked Illinois driver's license. The encounter lasted about five minutes.

¶ 11 Turning back to the events of May 29, 2024, Kocsor testified that there was "no change" in defendant's appearance at the gas station. Although it was raining, he was "100 percent certain" that defendant got into the driver's seat of the Hyundai. Nobody exited the car before it drove off from the scene.

¶ 12    Kocsor attempted to follow the car as it turned southbound on Wilmot Road. He followed the car as it made several turns, and he maintained clear sight of the car at all times. He observed the vehicle turn without signaling within 100 feet of an intersection. He then attempted to conduct a traffic stop on the car by activating his emergency lights, and the car came to a stop and parked. All occupants of the car remained in the car as he approached in his police uniform. Once he reached the car's rear bumper, defendant drove off at high speed. He alerted dispatch that the car had sped off, and he attempted to catch up to the car in his patrol vehicle.

¶ 13    While pursuing the car, Kocsor took note of his speed. Initially, his patrol vehicle attained a speed of 58 miles per hour in a 30 mile-per-hour zone, but this speed was not enough to catch up to the car—defendant "maintained a good distance and was gaining speed." The top speed that Kocsor reached in his pursuit was 81 miles per hour, but he still was unable to catch up to the car, and defendant continued to gain distance and speed on him. Kocsor reached his top speed of 81 miles per hour on Wilmot Road, with a posted speed limit of 50 miles per hour. He described the area in which he was pursuing defendant as primarily residential. After reaching 81 miles per hour and noting that the roads were wet, he terminated his pursuit in the interest of public safety.

¶ 14    Kocsor also described two intersections with stop signs: one at Bentley Lane and Vintage Way and another at Vintage Way and Wilmot Road. He observed the car turn at both intersections while disobeying the stop signs—that is, by not attempting to make a stop at all.

¶ 15    Kocsor learned that the registered owner of the Hyundai Elantra was not defendant but instead was Heather Kelly, who he identified as the female occupant of the car with defendant that night. The car was located later that day, parked in Kelly's driveway in Spring Grove.

¶ 16    Kocsor identified People's Exhibit 2A, which was edited dash cam footage from the front driving perspective of Kocsor's patrol vehicle. Defense counsel objected, and the trial court

admitted the evidence over objection but instructed the jurors that the recording was edited to eliminate portions that would not aid their understanding. The video, which was four minutes long, begins with Kocsor's vehicle following what appears to be a Hyundai sedan at night through a couple of turns at normal speed. Approximately 30 seconds into the video, Kocsor turns on his emergency lights and attempts a traffic stop, and the car pulls to a stop at the side of the road. Around timestamp 1:30 of the video, the camera shows Kocsor approaching the car in his police uniform. As he nears the rear of the car, the car accelerates quickly down the street. Kocsor returns to his vehicle and pursues the car, passing a 30 mile-per-hour speed sign on a residential street at approximately video timestamp 2:18, then a 50 mile-per-hour sign on a main road around timestamp 2:49. The car turns, and Kocsor follows it onto a road with a 45 mile-per-hour sign seen at timestamp 3:52. Kocsor's vehicle never comes close to catching the pursued car, with the car appearing to increase its lead on his vehicle until it is no longer within the frame of the camera by the end of the recording.

¶ 17    On cross-examination, defense counsel asked Kocsor, "It is your testimony that you knew Mr. Duddleston was driving; is that right?" He answered, "Correct." She then asked, "You can't be too sure as to who was actually driving the car; is that right?" and "You don't know who is driving the vehicle until you arrest them?" Kocsor disagreed.

¶ 18    Defense counsel then asked Kocsor about the police search of the car. Kocsor explained that, after the car was towed from Kelly's residence, he had sought a search warrant and then collected evidence from the car. The evidence collected from the car included drug paraphernalia, crack cocaine, and a stove with residue; "[i]t was basically a mobile cooking lab that was located in the vehicle." The vehicle was not searched for identification, fingerprints, or DNA. Kocsor admitted that nothing found in the vehicle was linked to defendant.

¶ 19    The State rested, and defendant moved for a directed verdict, which the trial court denied. The trial was continued to March 11, 2025, and the defense recalled Kocsor to identify the full dash cam video of his stop and pursuit of defendant, which was admitted without objection. The footage of the first four minutes of the video is the same as People's Exhibit 2A. The additional footage begins with Kocsor continuing to drive his patrol car, providing brief audible communication over the police radio. Around the 5:45 timestamp, he pulls his car over to the side of the road at an intersection. He remains stopped until timestamp 7:45, then turns the car around and begins driving back the way he had come. While doing this, he states, "I believe I saw that vehicle parked at [a] corner prior to me coming into contact with it," and he continues that he is heading to the location to see if it had footage of who was driving the car. The recording ends at the 9:49 timestamp with Kocsor continuing to drive in silence. Defense counsel also asked Kocsor whether he found any exterior surveillance videos of the car at the Mobil gas station, and he responded no.

¶ 20    Following Kocsor's testimony, the defense rested. In the defense's closing, counsel argued that even if Kocsor said he was certain he identified defendant as the driver, he was wrong and mistaken, citing a portion of the extended dash cam footage where he said he merely *believed* he saw the car parked at a corner prior to coming into contact with it. Counsel also emphasized that Kocsor never used defendant's name over the radio, arguing that the reason he did not use it was that he did not know who was driving the car. In addition, counsel argued that the jury was never shown footage from his body worn camera. In short, counsel challenged Kocsor's credibility regarding his identification of defendant as the driver.

¶ 21 The jury found defendant guilty of all five counts, including the two counts of aggravated fleeing (fleeing while speeding and fleeing while disobeying traffic signs) and the one count of driving while his license was revoked. The matter was continued for a sentencing hearing.

¶ 22                          B. Preliminary *Krankel* Inquiry

¶ 23 On May 6, 2025, defendant filed two motions: an amended motion for new trial, in which he argued that he received ineffective assistance of counsel at trial,[1] and a "motion to appoint special appointed counsel." Specifically, the amended motion for new trial alleged that his counsel was ineffective for "eliciting or suggesting evidence of his guilt during trial" and for failing to pursue a "valid defense" to the charges.

¶ 24 The same day, the trial court conducted a preliminary inquiry pursuant to *Krankel*, 102 Ill. 2d 181. The court asked defendant what his complaint was, and defendant first responded that, during cross-examination of Kocsor, his counsel referred to when Kocsor was "attempting to pull over the defendant," thereby placing him in the driver's seat of the car; "[my counsel] basically, in my eyes, told the jury I was the driver."

¶ 25 Defendant next argued that his counsel should have submitted pictures from the scene where Kocsor was sitting and claimed to observe him at the gas station. He continued that he thought he "probably should've been put on the stand, because I was a passenger," although he admitted that the court had asked him about his right to testify and that it was his decision not to testify, so he "really can't complain about that." Last, defendant raised that his counsel should have subpoenaed Kelly as the owner the car and had her testify.

---

[1]The original motion for new trial argued only that the State failed to prove defendant's guilt beyond a reasonable doubt on each count. The amended motion repeated that argument.

¶ 26   The trial court allowed defense counsel to respond to the complaints. She conceded that at some point she said something to the effect of "When you attempted to pull over [defendant]," when the better line of questioning would have been "When you attempted to pull over the vehicle." She "could've been more artful in that certainly if that is what I said."

¶ 27   Regarding photographs from the scene, defense counsel contended that was a matter of trial strategy and that she and defendant had decided not to introduce those photographs. The photographs were "[e]xactly what [defendant] wanted us to take photographs of, the gas station on the corner, the distance, et cetera." They were taken from the distance where Kocsor said he was sitting and from on the premises of the scene. Their assessment was that they did not believe the photographs would be harmful, but they also did not believe they would be helpful, and they did not want to confuse the issues. She explained that they held the position that Kocsor did not actually observe any of the individuals in the car, based on the audio from the dash cam footage (specifically, the line that he "believed" he saw the car earlier and that he would return to the scene to see if there was video of who was driving).

¶ 28   Regarding her decision to not subpoena Kelly, counsel admitted that it was possible that Kelly was the driver of the car, but Kelly had "pending cases open at the time" and she "may have her own self interest." Thus, counsel did not know whether calling Kelly would have been helpful or harmful.

¶ 29   Finally, regarding defendant testifying, counsel stated that she had discussed that option with defendant, but that defendant had advised her that he was a passenger in the car only after they had settled on a different theory of the case based on the audio of Kocsor on the dash cam footage. They "did not renegotiate [their] full trial strategy and relied simply on the audio."

Counsel later confirmed that she "in no way instructed him not to testify or anything like that" and that she "learned late, very late, that [defendant] said he was a passenger in the vehicle."

¶ 30    The trial court then turned back to defendant, who reiterated that it was his decision not to testify. The court asked him how late he disclosed to his attorney that he was a passenger in the vehicle, and he responded that it "probably was within a week before the trial." His counsel agreed with his timeframe of disclosure.

¶ 31    The trial court did not immediately decide the issue of whether to appoint independent counsel. The court wanted to review the transcript of cross-examination, and it postponed the sentencing hearing for a continued preliminary inquiry into defendant's claim of ineffective assistance of counsel.

¶ 32    On May 27, 2025, the trial court ruled on defendant's ineffective assistance of counsel claim. At the outset, the court stated that it had "considered both the facts and the legal merits of the defendant's posttrial allegations of ineffective assistance of counsel." The court ultimately found no factual basis necessitating the appointment of separate counsel, explaining its reasoning as follows. First, regarding defense counsel's cross-examination of Kocsor, the court had reviewed the transcript and identified an exchange concerning the distance for signaling a turn, in which counsel stated "so it would be really hard for the defendant to *** or anybody to signal a left turn within that 100 feet *** am I right?" The court noted that this was the only reference it saw that matched defendant's complaint and that the question was in the disjunctive, thus not necessarily identifying defendant as the driver. The court also noted that Kocsor had already testified that he was certain he identified defendant as the driver and repeatedly referred to the driver being defendant during his testimony. In this context, the court believed it was understandable that defense counsel would follow Kocsor's language before adding that it could be anybody making

the turn. The court then highlighted another passage in which counsel questioned Kocsor that he "can't be too sure as to who was actually driving the car."

¶ 33    Next, the trial court found the decision to not submit photographs was trial strategy. The court noted that Kocsor "basically admits to all of the, like, allegations about distance and everything" in cross-examination.

¶ 34    The court also found no basis for an ineffective assistance claim on defendant's decision not to testify. Defendant had conceded that it was his decision not to testify and that he had consulted on the issue with his counsel.

¶ 35    Last, regarding defense counsel's decision not to subpoena or call Kelly, the trial court found that defendant had not said whether Kelly would have admitted to being the driver, and even if she were asked to testify that she was the driver, she would have a fifth amendment right to remain silent because she would be testifying to uncharged criminal conduct. Furthermore, the decision whether to call a witness was a matter of trial strategy.

¶ 36    In sum, the trial court rejected all of defendant's ineffective-assistance claims and denied the motion to appoint special appointed counsel. The court also heard and denied the full amended motion for new trial.

¶ 37                                    C. Sentencing

¶ 38    After denying the amended motion for new trial, the trial court proceeded to the sentencing hearing. Defense counsel argued, in part, that if the trial court were to sentence defendant to a term of imprisonment, he was entitled to sentence credit for his time spent in the county jail working and taking remedial classes. The State responded that, under *Williamson*, 2024 IL App (3d) 220501, an individual does not get sentence credit for working in the county jail. Defense counsel replied that *Williamson* was wrongly decided because it misread the statute.

¶ 39    The trial court sentenced defendant to four years' imprisonment on count 1 for aggravated fleeing (speeding) and merged count 2 for aggravated fleeing (disregarding traffic signs) into count 1. On count 3 for driving with a revoked license, the court sentenced defendant to three years' imprisonment to be served concurrently with count one. The misdemeanor convictions of reckless driving and speeding merged into their respective felony convictions. The court took the sentence credit argument under advisement, allowing defense counsel time to submit supporting materials and for the court to review the issue. The court stated that it "tend[ed] to agree" with defendant's position, noting that the sentence credit is "on the State of Illinois Supreme Court's form, approved, and that's something that's filled out at the trial court level," but it would need to follow the law as it was stated in the *Williamson* opinion.

¶ 40    On June 17, 2025, defendant filed a motion for pretrial detention credit and a memorandum in support of the motion. The motion and memorandum stated that, while in custody at the McHenry County Jail, defendant worked and attended school. These assertions were supported by exhibits: an e-mail from Lieutenant Tarrance Brooks of the McHenry County Sheriff's Office stating that defendant had worked a total of 44 days, and an attached transcript of defendant's classes. Based on his work and school participation, defendant was seeking sentence credit pursuant to section 3-6-3(a)(4.2) of the Code (730 ILCS 5/3-6-3(a)(4.2) (West 2024)), arguing that the section was applicable not only to individuals committed to the Illinois Department of Corrections (IDOC) but also to those held in pretrial custody. He contended that he was entitled to half a day of credit for each day engaged in school and employment while in pretrial custody, totaling 72 days against his sentence.

¶ 41    The trial court heard the issue of sentence credit on June 25, 2025. The parties argued over the interpretation of the statute and the application of the *Williamson* opinion. The court also took

note of defendant's exhibits, citing Lieutenant Brooks's e-mail, which stated that defendant worked a total of 44 days, and the attached transcript, which the court described as "not necessarily clear, somewhat confusing, multiple pages of listing courses." The court did not make findings as to defendant's pretrial participation in work and educational programs, aside from finding that the evidence submitted did not show full-time participation in pretrial custody activities.

¶ 42 The trial court explained that it was obligated to follow the law, regardless of whether it agreed with the *Williamson* opinion, which held that section 3-6-3(a)(4.2) of the Code did not apply to programs completed in jail prior to sentencing to IDOC. Therefore, the court denied the sentence credit requested pursuant to section 3-6-3(a)(4.2). It also denied credit under section 3-6-3(a)(4)(A) because the court was not provided with evidence that defendant worked full-time.

¶ 43 Defendant filed an amended motion to reconsider sentence on July 1, 2025 (the original was filed June 25, 2025), adding the argument that the court erred in denying him sentence credit for activities in the county jail. The trial court heard and denied the amended motion to reconsider sentence on August 21, 2025. Defendant timely appealed.

¶ 44 II. ANALYSIS

¶ 45 Defendant raises two issues on appeal: (1) whether the trial court erred at his preliminary *Krankel* inquiry when it denied his request to appoint independent counsel to develop his claim of ineffective assistance of counsel and (2) whether the court erred in denying him sentence credit for his participation in pretrial programming. We address his arguments in turn.

¶ 46 A. Preliminary *Krankel* Inquiry

¶ 47 Defendant argues that the trial court's denial of his request to appoint new counsel to develop his posttrial claim of ineffective assistance of counsel was erroneous for two reasons: (1) the court applied the wrong standard to his claim by applying the full *Strickland* (*Strickland v.*

*Washington*, 466 U.S. 668 (1984)) standard for ineffective assistance of counsel and (2) his factual basis demonstrated possible neglect of his case. Before addressing the specifics of the arguments below, we provide the applicable legal standards and standards of review.

¶ 48    A defendant's *pro se* posttrial claim of ineffective assistance of trial counsel is governed by common-law procedure developed from our supreme court's decision in *Krankel*, 102 Ill. 2d 181. *In re Johnathan T.*, 2022 IL 127222, ¶ 23. The *Krankel* procedure is triggered when a defendant raises a claim of ineffective assistance posttrial. *Id.* ¶ 24. No written motion is required; the defendant needs only to bring the issue to the trial court's attention. *Id.* When the issue of ineffective assistance is raised by the defendant, the court does not automatically appoint new counsel. *People v. Jolly*, 2014 IL 117142, ¶ 29. Instead, the court must first examine the factual basis of the defendant's claim. *People v. Jackson*, 2020 IL 124112, ¶ 97. If the court determines that the claim lacks merit or pertains only to trial strategy, the court may deny the claim without appointing new counsel. *Id.* On the other hand, if the trial court determines that the defendant's allegations show possible neglect of the case, the court should appoint new counsel who will represent the defendant at a hearing on the *pro se* claim of ineffective assistance of counsel. *Id.*

¶ 49    In evaluating the defendant's claim, the trial court may briefly discuss the allegations with the defendant. *Jolly*, 2014 IL 117142, ¶ 30. The court may also speak with the defendant's trial counsel to assess the defendant's claim and whether further action is warranted. *Id.* In addition, the court may base its evaluation of the defendant's claim on its own knowledge of counsel's observed performance at trial. *Id.*

¶ 50    The applicable standard of review depends on whether the trial court determined the merits of the defendant's claim of ineffective assistance of counsel. *Jackson*, 2020 IL 124112, ¶ 98. The question whether the trial court properly conducted a preliminary *Krankel* inquiry is a legal

question that we review *de novo*. *Id.* If the court properly conducted its preliminary *Krankel* inquiry and reached the merits of the *Krankel* motion, our review is whether the court's action was manifestly erroneous. *Id.* An action is manifestly erroneous where the error is clearly evident, plain, and indisputable. *Id.* Here, we review *de novo* whether the trial court applied the correct standard at defendant's preliminary *Krankel* inquiry, and we review for manifest error the trial court's conclusion that defendant's claim lacked merit.

¶ 51                                    1. Proper Standard

¶ 52    Defendant argues that the trial court erroneously applied the full *Strickland* standard for ineffective assistance of counsel at the preliminary *Krankel* inquiry. He argues that, regarding defense counsel's cross-examination of Kocsor, the court said that it did not believe that defendant met the prongs of *Strickland* for that claim. In rejecting the argument over defendant's decision not to testify, the court stated that it did not find the *Strickland* standard satisfied or that there was a factual basis to support the contention. Finally, regarding the claim that counsel should have called Kelly as a witness, he argues that the court relied on case law that reached the merits of *Strickland* claims. In support of his position that the court applied the wrong standard, defendant relies on *People v. Jackson*, 2016 IL App (1st) 133741, ¶ 77 (requiring a new preliminary *Krankel* hearing for failure to consider possible neglect of the defendant's case).

¶ 53    Defendant's argument is foreclosed by recent decisions of our supreme court. In the unrelated case, *Jackson*, 2020 IL 1241112, the supreme court addressed the argument that the trial court applied the wrong criteria in denying the defendant's ineffective-assistance claim following a preliminary *Krankel* inquiry. *Id.* ¶ 101. There, the defendant had claimed that defense counsel was ineffective for failing to call two witnesses at trial. *Id.* ¶ 103. The defendant argued that the

trial court erred by applying a higher standard than possible neglect, requiring him to establish his counsel's ineffectiveness at the preliminary hearing. *Id.* ¶ 104.

¶ 54 The supreme court rejected this argument, citing its decision in *People v. Roddis*, 2020 IL 124352. In *Roddis*, the court stated that "even in preliminary *Krankel* inquiries, a trial court must be able to consider the merits *in their entirety* when determining whether to appoint new counsel on a *pro se* posttrial claim of ineffective assistance of counsel" and that allowing consideration of the merits served "both the ends of justice and judicial economy." (Emphasis in original.) *Id.* ¶ 61. Accordingly, the supreme court in *Jackson* affirmed the trial court's denial of the defendant's ineffective-assistance claim, agreeing with the trial court's conclusion that the sufficiency of the allegations failed on their face to substantiate a claim of ineffective assistance. *Jackson*, 2020 IL 124112, ¶ 106. The supreme court explained that whether to call certain witnesses was a matter of trial strategy, and because the defendant's allegations related to trial strategy, they could not serve as the basis of a *Krankel* claim. *Id.*

¶ 55 Here, the trial court rejected defendant's claims of ineffective assistance after considering both the factual basis for defendant's claims as well as the merits of those claims under the two-pronged analysis set forth in *Strickland*, 466 U.S. 668. Under *Jackson* and *Roddis*, this was proper. Importantly, the court's preliminary *Krankel* inquiry examined the factual nature of defendant's claims; the court asked relevant questions of both defendant and his trial counsel, and it reviewed the evidence adduced at trial. After listening to the relevant parties and reviewing the evidence, the court reached conclusions that the purported errors lacked a factual basis, did not satisfy the *Strickland* standard, or both. See *Roddis*, 2020 IL 124352, ¶ 56 ("The court can base its evaluation of the defendant's *pro se* allegations of ineffective assistance on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." (Internal

quotation marks omitted.)). For example, on whether defense counsel was ineffective for not calling Kelly, the court stated that such a decision was generally a matter of trial strategy, which "cannot form the basis for a claim of ineffective assistance of counsel unless the trial strategy is so unsound that counsel can be said to have entirely failed to conduct any meaningful adversarial testing of the State's prosecution." Thus, the court found that defendant had "not made a requisite factual showing with that claim *** and it doesn't meet *Strickland* in this case."

¶ 56     The facts of this case are unlike the facts in the appellate decision that defendant relies on, namely, *Jackson*, 2016 IL App (1st) 133741. There, the defendant argued that the trial court erred by not considering possible neglect but instead proceeding directly to the merits of a *Strickland* claim, and the State agreed that the trial court erred on this point. *Id.* ¶¶ 75-76. The appellate court found that the trial court had not performed an appropriate preliminary *Krankel* hearing, that is, one that was neutral and non-adversarial with the goal of ascertaining the factual basis of the claims. *Id.* ¶ 77. Before the trial court, the defendant in *Jackson* had attempted to raise his claims by reading from a written document, but the trial court repeatedly instructed him not to read but to argue. *Id.* ¶ 70. The defendant kept trying to read from the document, saying it was the only way to present his argument. *Id.* When the trial court discovered that the defendant was reading from an eight-page document, it indicated that it would not allow the defendant to read the entire document, and the record showed that the defendant was not allowed to read the entire document or otherwise make a full record of his complaint before the trial court. *Id.*

¶ 57     In contrast here, the trial court did not limit defendant's ability to fully raise and develop his claims. As already noted, it questioned both defendant and his trial counsel in order to gather facts, and then it took the matter under advisement to review the portions of the record relevant to defendant's claims. This case falls squarely under the purview of our supreme court's recent

decisions permitting review of the merits at a preliminary *Krankel* inquiry and is distinguishable from the First District's decision in *Jackson*, where the trial court did not permit a full factual development of the defendant's claims. Accordingly, the trial court did not err by applying an incorrect standard.

¶ 58                                    2. Defendant's Factual Basis

¶ 59    Defendant also argues that he presented a sufficient factual basis to support the appointment of new counsel by raising that his trial counsel failed to investigate Heather Kelly as a potential trial witness. He contends that Kelly was present in the car on the night of his alleged offenses and was the actual owner of the car. He argues that, at the very least, his trial counsel should have interviewed Kelly to discover what she would have testified to at trial, and had the court appointed an independent attorney following the preliminary *Krankel* inquiry, new counsel would have been able to conduct such an interview. He concludes that choosing not to subpoena a potentially exonerating witness without first determining how the witness would testify demonstrated possible neglect of his case.

¶ 60    We reject defendant's argument. Here, the trial court questioned both defendant and defense counsel about defendant's claims at the preliminary *Krankel* inquiry. Counsel admitted that it was possible that Kelly was the driver of the car, but she explained her decision not to call Kelly was based on Kelly having pending criminal cases and her concern that Kelly would value her own self-interest. Furthermore, defendant told the court that he had informed his counsel only about a week before trial that he was a passenger and not the driver of the car. His counsel agreed that defendant had disclosed to her that he was a passenger only shortly before trial. Counsel explained that she and defendant had already established a trial strategy challenging Kocsor's identification of defendant as the driver.

¶ 61    Under the circumstances of this case, the trial court properly concluded that defense counsel's decision not to interview or call Kelly was a matter of trial strategy. See *People v. Peterson*, 2017 IL 120331, ¶ 80 (generally, the decision whether to call a witness for a defense is a matter of trial strategy left to defense counsel's discretion after consultation with the defendant). Kocsor's testimony already established that Kelly was the owner of the car. Having her testify that she—and not defendant—was the driver of the car would have subjected her to many of the same offenses charged against defendant. Even if she testified that she and defendant were passengers, with a third person driving the car, that testimony would have recently placed her in the car she owned where the police found drug paraphernalia and crack cocaine that same day. The reasonable likelihood that Kelly would have either invoked her right against self-incrimination or been motivated to testify untruthfully supported the trial strategy not to call her, regardless of what an interview may have revealed. Defendant's late disclosure that he was a passenger only underscores the reasonableness of counsel's strategy. Instead of injecting uncertainty into defendant's trial strategy, which counsel and defendant had already discussed and agreed upon, counsel proceeded to trial with the plausible theory that Kocsor could not have accurately identified defendant as the driver under the circumstances. We note that attacking Kocsor's credibility was critical to a successful defense because even if Kelly had testified that defendant was not the driver, the jury still would have needed to decide whether to believe her testimony over Kocsor's. Accordingly, the trial court did not err in determining that these facts did not support possible neglect of the case and that defendant's claim lacked merit.

¶ 62    For the aforementioned reasons, the trial court did not err in rejecting defendant's posttrial ineffective-assistance-of-counsel claim and denying his request to appoint independent counsel.

¶ 63                                    B. Sentence Credit

¶ 64    Defendant's second argument is that he was entitled under section 3-6-3(a)(4.2)(A) of the Code (730 ILCS 5/3-6-3(a)(4.2)(A) (West 2024)) to 72 days of sentence credit for his pretrial detention activities—namely, working in the county jail kitchen and attending classes while in the county jail. Defendant argues that the trial court erred in denying him sentence credit because the plain language of the statute supported an award of credit for activities completed in county jail. In particular, defendant argues that the language of "any prisoners" in section 3-6-3(a)(4.2)(A) clearly includes individuals in pretrial detention.

¶ 65    Defendant also argues that, even if the language of the statute is ambiguous, the statute should be interpreted in his favor for several reasons, including the relevant legislative history and the rule of lenity. Defendant contends that section 3-6-3(a)(4.2)(A) came into effect on July 1, 2021, as part of a broad criminal reform commonly known as the Pretrial Fairness Act, with the intent of encouraging rehabilitative opportunities to pretrial detainees. Defendant asks that we construe the statute to further the objective of encouraging pretrial detainees to participate in pretrial programming, and he contends that an interpretation of the statute to the contrary—where we say we want to encourage participation in certain activities but then deny credit for participation—would amount to an absurd or unjust result.

¶ 66    The State responds that *Williamson* already correctly decided the issue and that the plain language of section 3-6-3(a)(4.2)(A) clearly and unambiguously supports that defendant was not entitled to any sentence credit for his activities completed during pretrial detention.

¶ 67    Defendant's argument presents an issue of statutory construction, which we review *de novo*. *In re Estate of Nocchi*, 2023 IL App (2d) 220124, ¶ 14. "The primary objective of statutory construction is to ascertain and give effect to the legislature's intent." *Evans v. Cook*

*County State's Attorney*, 2021 IL 125513, ¶ 27. The best and most reliable indicator of that intent is the statutory language given its plain and ordinary meaning. *People v. Young*, 2011 IL 111886, ¶ 11. Statutes are construed as a whole, and words and phrases should not be read in isolation but in light of other relevant provisions of the statute. *Mosby v. Ingalls Memorial Hospital*, 2023 IL 129081, ¶ 30. In construing statutes, "we presume that the legislature did not intend absurdity, inconvenience, or injustice." *Dynak v. Board of Education of Wood Dale School District 7*, 2020 IL 125062, ¶ 16.

¶ 68    When statutory language is plain and unambiguous, we may not depart from the statute's plain language by reading into it exceptions, limitations, or conditions beyond what the legislature expressed. *Mosby*, 2023 IL 129081, ¶ 31. Furthermore, when the statutory language is clear, we will give the language effect without resort to other aids of statutory construction. *Lee v. John Deere Insurance Co.*, 208 Ill. 2d 38, 43 (2003). However, even when the language is plain and unambiguous, we may still consider the reason for the law, the problems the law seeks to remedy, and the consequences of construing a statute one way or another. *Mosby*, 2023 IL 129081, ¶ 31.

¶ 69    If the statutory language is ambiguous, we may turn to extrinsic aids of statutory construction, including legislative history and canons of statutory construction. *Nowak v. City of Country Club Hills*, 2011 IL 111838, ¶ 13. Statutory language is ambiguous if it is capable of more than one reasonable interpretation. *Lisle Savings Bank v. Tripp*, 2021 IL App (2d) 200019, ¶ 16. We bear in mind that the most literal interpretation of statutory language is not necessarily the only reasonable interpretation. *Id.*

¶ 70    Moreover, under the rule of lenity, ambiguous criminal statutes will generally be construed in the defendant's favor. *People v. Gutman*, 2011 IL 110338, ¶ 12. However, the rule of lenity does not apply simply because there is an ambiguity in a criminal statute; its application is a last resort

for a "grievous ambiguity" that leaves us with a mere "guess" at what the legislature intended. (Internal quotation marks omitted.) *Id.* ¶¶ 43-44 (quoting *Muscarello v. United States*, 524 U.S. 125, 138-39 (1998)). In other words, the rule of lenity provides that " 'the tie must go to the defendant.' " *Id.* ¶ 26 (quoting *United States v. Santos*, 553 U.S. 507, 514 (2008)).

¶ 71 The relevant statutory language is found in section 3-6-3(a)(4.2), which provides as follows:

> "(4.2)(A) The rules and regulations shall also provide that any prisoner engaged in self-improvement programs, volunteer work, or work assignments that are not otherwise eligible activities under paragraph (4), shall receive up to 0.5 days of sentence credit for each day in which the prisoner is engaged in activities described in this paragraph.
>
> (B) The rules and regulations shall provide for the award of sentence credit under this paragraph (4.2) for qualifying days of engagement in eligible activities occurring prior to July 1, 2021 (the effective date of Public Act 101-652)." 730 ILCS 5/3-6-3(a)(4.2) (West 2024).

¶ 72 In deciding this issue, we first examine the *Williamson* decision, which previously interpreted section 3-6-3(a)(4.2) of the Code (*id.*). In *Williamson*, the defendant worked as a kitchen tender for 242 days while in custody prior to sentencing, for which he requested 121 days of sentence credit pursuant to section 3-6-3(a)(4.2). *Williamson*, 2024 IL App (3d) 220501, ¶¶ 4, 21. The trial court denied his request, finding that section 3-6-3(a)(4.2)[2] applied only to individuals

---

[2]At the time of the defendant's 2022 sentencing in *Williamson*, section 3-6-3(a)(4.2) did not have a part (A) and (B). See 730 ILCS 5/3-6-3(a)(4.2) (West 2022) (effective through December 31, 2023). Rather, section 3-6-3(a)(4.2) contained only the text that would comprise section 3-6-3(a)(4.2)(A) of the current version of the statute.

who were serving time in IDOC. *Id.* ¶ 21. On appeal, the defendant argued that his presence work qualified for sentence credit under the plain language of section 3-6-3(a)(4.2). *Id* ¶ 22.

¶ 73     The *Williamson* court affirmed, holding that section 3-6-3(a)(4.2) did not entitle the defendant to sentence credit for work performed during pretrial custody. *Id.* ¶ 26. The court compared section 3-6-3(a)(4.2) to sections 3-6-3(a)(4)(A) and (a)(4.1), which, unlike section 3-6-3(a)(4.2), explicitly mentioned sentence credit for individuals held in pretrial custody. *Id.* ¶ 25. The court continued that "[h]ad the legislature intended for [section 3-6-3(a)(4.2)] to apply to inmates in pretrial custody, it would have expressly stated that intention as it did in the other sections." *Id.* ¶ 26. Thus, viewing the statute in its entirety, the court found that the legislature did not intend for section 3-6-3(a)(4.2) to apply to individuals held in pretrial custody. *Id.*

¶ 74     The court further rejected the defendant's argument that his preprinted IDOC sentencing order, which contained a section for credit for pretrial work assignments, affected its plain reading of the statute. *Id.* ¶ 27. It stated that "the erroneous inclusion of this sentencing credit option on the preprinted Will County sentencing order does not render an otherwise unambiguous statute ambiguous" and that the sentencing order simply did not alter the "straightforward statutory scheme." *Id.*

¶ 75     We disagree with the *Williamson* court's analysis because we interpret the plain language of section 3-6-3(a)(4.2) to permit sentence credit for engagement in activities while in jail for pretrial detention and in IDOC serving a sentence. First, we note, as did the *Williamson* court, that the Code does not define the term "prisoner" but uses the term interchangeably throughout section 3-6-3 with the term "inmate." See 730 ILCS 5/3-6-3(a)(3), (a)(3.5), (a)(4), (c), (f) (West 2024) (all

using "inmate" in place of "prisoner" at least once)[3]; *Williamson*, 2024 IL App (3d) 220501, ¶ 23 (noting that "the statute does use the terms prisoner and inmate interchangeably"); see also 730 ILCS 5/3-6-3(a)(4.1) (West 2024) (using the terms "prisoner" and "committed person" in similar ways). Thus, we do not find any interpretative significance to the legislature's fluctuation throughout section 3-6-3 between the terms "prisoner" and "inmate," including its use of only the term "prisoner" in section 3-6-3(a)(4.2).

¶ 76    Next, we observe that throughout section 3-6-3 of the Code, the term "prisoner" is often followed by language limiting the category of prisoners addressed by a subsection. For instance, in section 3-6-3(a)(2), the legislature addresses sentence credit limits for prisoners *who are serving sentences for specific offenses* (*e.g.*, first degree murder, terrorism, and home invasion). In section 3-6-3(a)(4)(A), the statute refers to prisoners who are engaged in full-time programs *provided by IDOC* and inmates *who were held in pretrial detention* and successfully completed a full-time program *in county jail*. And, in section 3-6-3(a)(4.1), the statute refers to prisoners who attain various educational achievements *while in IDOC* and committed persons who attain various educational achievements *while in pretrial detention*.

¶ 77    Section 3-6-3(a)(4.2)(A) reads differently. Instead of limiting the class of detained persons to IDOC prisoners, the section refers simply to "any prisoner" and lists what any prisoner must do to be eligible for sentence credit—namely, engage in "self-improvement programs, volunteer work, or work assignments that are not otherwise eligible under paragraph (4)." The section's reference back to paragraph 4 clearly contemplates sentence credit for both pretrial and post-sentencing activities, as paragraph 4 includes both inmates who completed qualifying programs in

---

[3]A word search of section 3-6-3 shows that the word "prisoner," excluding use in the term "Prisoner Review Board," appears 65 times, and the word "inmate" appears 39 times.

pretrial detention and prisoners who completed qualifying programs at IDOC. Both classes of detainees are expressly addressed in section 3-6-3(a)(4)(A) but neither are expressly mentioned in section 3-6-3(a)(4.2)(A). Furthermore, section 3-6-3(a)(4.2)(B) makes clear that engagement in the section's listed activities is permitted to have taken place in the past but, like in part (A), part (B) does not make any mention of whether prior activity had to take place while serving a sentence in IDOC. See 730 ILCS 5/3-6-3(a)(4.2)(B) (West 2024) (permitting an award of sentence credit for "qualifying days of engagement in eligible activities occurring prior to July 1, 2021").

¶ 78   Like the *Williamson* court, we find that the lack of limiting language in section 3-6-3(a)(4.2) is significant to the section's interpretation. The *Williamson* court said that "[h]ad the legislature intended for this section to apply to inmates in pretrial custody, it would have expressly stated that intention as it did in other sections." *Williamson*, 2014 IL App (3d) 220501, ¶ 26. We note that the same could be said for inmates in the custody of IDOC; the legislature knew how to specify when credit applies only to activity in IDOC versus activity in pretrial detention, but it chose to expressly mention neither. In other words, where the *Williamson* court focused only on the lack of express language referring to prisoners held in pretrial custody, we focus on the legislature's concurrent omissions of any express language discriminating between prisoners' pretrial engagement and their engagement while in IDOC.

¶ 79   Thus, we agree with defendant that "any prisoner" engaged in the activities listed in section 3-6-3(a)(4.2) includes both prisoners who engaged in those activities while in IDOC and those who engaged in those activities while in pretrial detention. Although we base our interpretation on the plain language of section 3-6-3(a)(4.2), given our conflicting interpretation with the Third District in *Williamson*, we continue to examine extrinsic aids to interpret section 3-6-3(a)(4.2) and find that they align with the section's plain language.

¶ 80 Before reviewing extrinsic aids of statutory construction, we briefly mention that the trial court acted properly in following the *Williamson* opinion. *Williamson* was precedent that the trial court was bound to follow. *People v. Carpenter*, 228 Ill. 2d 250, 259 (2008) (appellate court decisions " 'are binding precedent on all circuit courts regardless of locale' " (quoting *People v. Harris*, 123 Ill. 2d 113, 128 (1988))); see *People v. Doe*, 2024 IL App (2d) 230196, ¶ 39 (adding that when conflicts arise among appellate districts, a circuit court is bound by the appellate decisions of the district in which it sits). In fact, the trial court's first instinct before reading *Williamson* was that defendant was likely entitled to sentence credit. We, however, are not bound by the *Williamson* opinion. *O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 440 (2008) ("[T]he opinion of one district, division, or panel of the appellate court is not binding on other districts, divisions, or panels."). Therefore, we continue with our *de novo* examination of the statute.[4]

¶ 81 Two extrinsic aids are illuminating: (1) the legislative history addressing section 3-6-3(a)(4.2) and (2) the supreme court's administrative order from its website, which provides a preprinted section for the trial court to award sentence credit pursuant to section 3-6-3(a)(4.2). First, the context for adding section 3-6-3(a)(4.2) to the Code was the passage of Public Act 101-

---

[4]We note that several decisions of other districts have followed *Williamson*'s interpretation. See, *e.g.*, *People v. Perteet*, 2025 IL App (1st) 241141, ¶ 26 (citing *Williamson* to support its statement that section 3-6-3(a)(4.2) applies only to prisoners, not pretrial detainees), *vacated*, 274 N.E. 3d 105 (Ill. 2026) (denying the petition for leave to appeal and vacating the judgment with direction to remand to the circuit court for a hearing to determine the defendant's pretrial programming credit due); *People v. Woods*, 2025 IL App (4th) 241136-U, ¶¶ 32-33 (rejecting the argument that *Williamson* incorrectly interpreted section 3-6-3(a)(4.2)), *pet. for leave to appeal denied*, 2025 IL 131809.

652 (eff. Jan 1, 2023), informally known as the "Pretrial Fairness Act." *Rowe v. Raoul*, 2023 IL 129248, ¶ 4. The supreme court had previously created the Illinois Supreme Court Commission on Pretrial Practices to report and recommend reform on pretrial practices (*id.* ¶ 3), and in the year after the commission's final report, the legislature comprehensively overhauled multiple parts of the state's criminal justice system (*id.* ¶ 4). One of the primary purposes of the Pretrial Fairness Act was its focus on reform of the State's laws surrounding pretrial detention; statutory extension of sentence credit to prisoners who complete pretrial programming aligns with the Act's purpose and the legislature's general goal of equitably reforming pretrial detention.

¶ 82     Before passage of the Pretrial Fairness Act, the Code was amended to permit sentence credit to prisoners for pretrial participation in certain activities or programming. Prior to June 22, 2012, section 3-6-3 of the Code made no mention of awarding sentence credit for programming completed during pretrial detention, but thereafter, several sections expanded sentence credit to prisoners who completed qualifying activities while in pretrial detention. Compare Pub. Act 97-333 (eff. Aug. 12, 2011) (amending 730 ILCS 5/3-6-3) (lacking a subsection (a)(1.5); in subsection (a)(4), addressing only prisoners completing programs in IDOC; and in subsection (a)(4.1), providing good conduct credit to prisoners who passed the high school GED test only while in IDOC), with Pub. Act 97-697 (eff. June 22, 2012) (amending 730 ILCS 5/3-6-3) (adding subsection (a)(1.5), which generally permitted sentence credit for completion of programming while in custody prior to sentencing; in subsection (a)(4), adding sentence credit for prisoners completing programs in county jail; and in subsection (a)(4.1), adding sentence credit for prisoners passing the high school GED test while in pretrial detention).

¶ 83     In particular, the addition of section 3-6-3(a)(1.5) of the Code (730 ILCS 5/3-6-3(a)(1.5) (2024)) reflected clear legislative intent to award sentence credit for programming completed

during pretrial detention. Section 3-6-3(a)(1.5) currently provides in relevant part that as "otherwise provided by law, sentence credit may be awarded for *** successful completion of programming while in custody of the Department of Corrections *** *or while in custody prior to sentencing*." (Emphasis added.) *Id.* The plain language of this section demonstrates an intent that sentence credit be generally available for programming completed while in pretrial custody.

¶ 84     Then, as part of the Pretrial Fairness Act, the 2021 amendment to section 3-6-3 of the Code expanded sentence credit available to prisoners by adding section 3-6-3(a)(4.2). Whereas under section 3-6-3(a)(4)(A) of the Code a prisoner had to *complete full-time programming* in either IDOC or in pretrial detention, under section 3-6-3(a)(4.2), a prisoner needed only to *engage in activities* not otherwise eligible for credit under paragraph (4). The trajectory of legislative amendments to section 3-6-3 shows a desire to expand, not contract, prisoners' eligibility for sentence credit. This trajectory supports a legislative intent in section 3-6-3(a)(4.2)(A) to provide sentence credit to prisoners completing qualifying activities in pretrial detention, as well as in IDOC.[5]

¶ 85     Although not directly indicative of legislative intent, we also find instructive our supreme court's administrative form entitled "Judgment – Sentence to Illinois Department of Corrections," which is available from the Illinois Courts website (illinoiscourts.gov/documents-and-forms). Ill.

---

[5]We note that Illinois Senate Bill 3333 would seek to clarify that section 3-6-3(a)(4.2)(A) applies to pretrial detainees. See 104th Ill. Gen. Assem., Senate Bill 3333, 2025 Sess. (modifying section 3-6-3(a)(4.2) to begin "The rules and regulations shall also provide that any prisoner *or inmate who was held in pretrial detention prior to his or her confinement to the Department of Corrections ***.*" (Emphasis added.)). Senate Bill 3333 passed both houses on May 29, 2026, and as of June 3, 2026, had not been signed into law. No effective date is listed in the bill.

- 27 -

Sup. Ct. Comm'n on Access to Just., Judgment–Sentence to Illinois Department of Corrections Form, https://ilcourtsaudio.blob.core.windows.net/antilles-resources/resources/0e5fff82-c135-4558-aae1-c0bb7345f0c2/Judgment_Sentence_to_DOC.pdf (last visited June 19, 2026) [https://perma.cc/C3M9-KKY4]. The standard form, which is substantially the same form as the trial court used to sentence defendant in this case, provides preprinted lines for a defendant's sentences to IDOC and for sentence credit, including a line specifically for sentence credit pursuant to section 3-6-3(a)(4.2) that reads:

> "The Court further finds that the Defendant served ____ days engaged in a self-improvement program, volunteer work, or work assignments, and shall receive 0.5 days of sentence credit for each day the Defendant was engaged in activities for a total of _____. (730 ILCS 5/3-6-3(a)(4.2))."

Obviously, because this is a sentencing form, all referenced programs and work must have occurred previously and thus outside of IDOC.

¶ 86    The *Williamson* court was correct that the content of a form does not render a clear statute ambiguous (see *Williamson*, 2024 IL App (3d) 220501, ¶ 27), but we hold that, contrary to *Williamson*, the statute is indeed clear that pretrial activities are to be credited. To the extent that our disagreement may be construed as demonstrating an ambiguity, we may look beyond the language of the statute to resolve it. The supreme court's form supports a reasonable belief that, were the supreme court to examine the issue before us, it would interpret section 3-6-3(a)(4.2) in harmony with its own form as opposed to finding that form erroneous.[6]

---

[6]We note that there is an inconsistency with the form's implementation of the statute. While the statute says prisoners "shall receive *up to* 0.5 days of sentence credit" (emphasis added) (730 ILCS 5/3-6-3(a)(4.2) (West 2024)), the form simply says "shall receive 0.5 days of sentence credit," which overlooks

¶ 87    In sum, the statute's plain language, as well as extrinsic aids, support that section 3-6-3(a)(4.2) permits prisoners sentence credit for engaging in the listed activities while in custody prior to sentencing. In addition, common sense advises that—where the legislature intends to encourage rehabilitation and good behavior in custody through work, study, and programming—the legislature intends to encourage rehabilitation and good behavior at all stages of custody unless expressly limited.

¶ 88    Last, even if the statute were ambiguous and extrinsic aids were to leave us with nothing more than a guess as to the legislature's intent (which they do not), defendant is correct that the rule of lenity would direct our construction of the statute to permit him sentence credit for his work and schooling during his time in county jail.

¶ 89    For all these reasons, we hold that sentence credit under section 3-6-3(a)(4.2)(A) is available to prisoners regardless of whether they engage in the described activities while in IDOC or while in custody prior to sentencing. On remand, the trial court shall make findings regarding defendant's sentence credit due and award sentence credit, if any, pursuant to section 3-6-3(a)(4.2)(A).

¶ 90                                III. CONCLUSION

¶ 91    For the reasons stated, we affirm the judgment of circuit court of McHenry County and remand for a determination of whether, in the circuit court's discretion, defendant should be given sentence credit for activities undertaken while he was held in McHenry County Jail prior to his sentencing hearing. If sentence credit is warranted, the court is directed to calculate the credit due, pursuant to section 3-6-3(a)(4.2)(A) of the Code.

---

the legislature's apparent intent to grant the trial court discretion to award less than 0.5 days of sentence credit under section 3-6-3(a)(4.2)(A).

¶ 92    Affirmed and remanded with directions.

*People v. Duddleston*, 2026 IL App (2d) 250365

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of McHenry County, No. 24-CF-522; the Hon. Tiffany E. Davis, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Christopher McCoy, and Amaris Danak, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Randi L. Freese, State's Attorney, of Woodstock (Patrick Delfino, Edward R. Psenicka, and Julie M. Angus, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |